UNITED STATES *v.* FREED ET AL.

No. 345.   Argued January 11, 1971—Decided April 5, 1971

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, BRENNAN (as to Part I), STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, *post*, p. 610.

*Matthew J. Zinn* argued the cause for the United States. On the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Peter L. Strauss, Beatrice Rosenberg,* and *Mervyn Hamburg.*

*Luke McKissack* argued the cause and filed a brief for appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Following our decision in *Haynes* v. *United States,* 390 U. S. 85, Congress revised the National Firearms Act with the view of eliminating the defects in it which were revealed in *Haynes.*[1]

At the time of *Haynes* "only weapons used principally by persons engaged in unlawful activities would be subjected to taxation." *Id.,* at 87. Under the Act, as amended, all possessors of firearms as defined in the Act[2]

---

[1] See S. Rep. No. 1501, 90th Cong., 2d Sess., 26, 42, 48, 52; H. R. Conf. Rep. No. 1956, 90th Cong., 2d Sess., 35.

[2] 26 U. S. C. § 5845 (f) (1964 ed., Supp. V) defines "destructive device" to include "grenades" which are involved in the present case.

are covered, except the Federal Government.   26 U. S. C. § 5841 (1964 ed., Supp. V).

At the time of *Haynes* any possessor of a weapon included in the Act was compelled to disclose the fact of his possession by registration at any time he had acquired possession, a provision which we held meant that a possessor must furnish potentially incriminating information which the Federal Government made available to state, local, and other federal officials.   *Id.,* at 95–100. Under the present Act[3] only possessors who lawfully

---

[3] Title 26 U. S. C. § 5812 (a) (1964 ed., Supp. V) provides:

"A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary or his delegate a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary or his delegate; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary or his delegate may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary or his delegate may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary or his delegate may by regulations prescribe; and (6) the application form shows that the Secretary or his delegate has approved the transfer and the registration of the firearm to the transferee.   Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law."

Title 26 U. S. C. § 5812 (b) (1964 ed., Supp. V) provides:

"The transferee of a firearm shall not take possession of the firearm unless the Secretary or his delegate has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section."

Title 26 U. S. C. § 5841 (b) (1964 ed., Supp. V) provides:

"Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes.   Each firearm transferred shall be registered to the transferee by the transferor."

make, manufacture, or import firerams can and must register them; *the transferee does not and cannot register.* It is, however, unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." [4]

At the time of *Haynes,* as already noted, there was a provision for sharing the registration and transfer information with other law enforcement officials. *Id.,* at 97–100. The revised statute explicitly states that no information or evidence provided in compliance with the registration or transfer provisions of the Act can be used, directly or indirectly, as evidence against the registrant or applicant "in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence." [5] The scope of the privilege extends, of course, to the hazards of prosecution under state law for the same or similar offenses. See *Malloy* v. *Hogan,* 378 U. S. 1; *Marchetti* v. *United States,* 390 U. S. 39, 54. And the appellees, apparently fearful that the Act as written does not undertake to bar the use of federal filings in state prosecutions, urge that those risks are real in this case. It is said that California statutes [6] punish the possession of grenades and that federal registration will incriminate appellees under that law.

The Solicitor General, however, represents to us that *no information filed* is as a matter of practice disclosed to any law enforcement authority, except as the fact of nonregistration may be necessary to an investigation or prosecution under the present Act.

The District Court nonetheless granted the motion to dismiss on two grounds: (1) the amended Act, like the

---

[4] 26 U. S. C. § 5861 (d) (1964 ed., Supp. V).

[5] 26 U. S. C. § 5848 (1964 ed., Supp. V); and see 26 CFR § 179.202.

[6] Penal Code § 12303 (1970).

version in *Haynes,* violates the Self-Incrimination Clause of the Fifth Amendment; and (2) the conspiracy "to possess destructive devices" and the possession charged do not allege the element of scienter. The case is here on direct appeal. 18 U. S. C. § 3731. And see *United States* v. *Spector,* 343 U. S. 169; *United States* v. *Nardello,* 393 U. S. 286.

I

We conclude that the amended Act does not violate the Self-Incrimination Clause of the Fifth Amendment which provides that no person "shall be compelled in any criminal case to be a witness against himself." As noted, a lawful transfer of a firearm may be accomplished only if it is already registered. The transferor—not the transferee—does the registering. The transferor pays the transfer tax and receives a stamp [7] denoting payment which he affixes to the application submitted to the Internal Revenue Service. The transferor must identify himself, describe the firearm to be transferred, and the name and address of the transferee. In addition, the application must be supported by the photograph and fingerprints of the transferee and by a certificate of a local or federal law enforcement official that he is satisfied that the photograph and fingerprints are those of the transferee and that the weapon is intended for lawful uses.[8] Only after receipt of the approved application form is it lawful for the transferor to hand the firearm over to the transferee. At that time he is to give the approved application to the transferee.[9] As noted, the Solicitor General advises us that the information in the hands of Internal Revenue Service, as a matter of practice, is not available to state or other federal authorities

---

[7] 26 U. S. C. § 5811 (1964 ed., Supp. V).

[8] 26 U. S. C. § 5812 (a) (1964 ed., Supp. V); 26 CFR §§ 179.98–179.99.

[9] 26 CFR § 179.100.

and, as a matter of law, cannot be used as evidence in a criminal proceeding with respect to a prior or concurrent violation of law.[10]

The transferor—not the transferee—makes any incriminating statements. True, the transferee, if he wants the firearm, must cooperate to the extent of supplying fingerprints and photograph. But the information he supplies makes him the lawful, not the unlawful, possessor of the firearm. Indeed, the only transferees who may lawfully receive a firearm are those who have not committed crimes in the past. The argument, however, is that furnishing the photograph and fingerprints will incriminate the transferee in the future. But the claimant is not confronted by "substantial and 'real'" but merely "trifling or imaginary hazards of incrimination"—*first* by reason of the statutory barrier against use in a prosecution for prior or concurrent offenses, and *second* by reason of the unavailability of the registration data, as a matter of administration, to local, state, and other federal agencies. *Marchetti* v. *United States, supra,* at 53–54. Cf. *Minor* v. *United States,* 396 U. S. 87, 94. Since the state and other federal agencies never see the information, he is left in the same position as if he had not given it, but "had claimed his privilege in the absence of a . . . grant of immunity." *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 79. This, combined with the protection against use to prove prior or concurrent offenses, satisfies the Fifth Amendment requirements respecting self-incrimination.[11]

Appellees' argument assumes the existence of a periphery of the Self-Incrimination Clause which pro-

---

[10] 26 U. S. C. § 5848 (1964 ed., Supp. V); 26 CFR § 179.202.

[11] We do not reach the question of "use immunity" as opposed to "transactional immunity," cf. *Piccirillo* v. *New York,* 400 U. S. 548, but only hold that, under this statutory scheme, the hazards of self-incrimination are not real.

tects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation.

Another argument goes to the question of entrapment. But that is an issue for the trial, not for a motion to dismiss.

## II

We also conclude that the District Court erred in dismissing the indictment for absence of an allegation of scienter.

The Act requires no specific intent or knowledge that the hand grenades were unregistered. It makes it unlawful for any person "to receive or possess a firearm which is not registered to him." [12] By the lower court decisions at the time that requirement was written into the Act the only knowledge required to be proved was knowledge that the instrument possessed was a firearm. See *Sipes* v. *United States*, 321 F. 2d 174, 179, and cases cited.

The presence of a "vicious will" or *mens rea* (*Morissette* v. *United States*, 342 U. S. 246, 251) was long a requirement of criminal responsibility. But the list of exceptions grew, especially in the expanding regulatory area involving activities affecting public health, safety, and welfare. *Id.*, at 254. The statutory offense of embezzlement, borrowed from the common law where scienter was historically required, was in a different category.[13] *Id.*, at 260–261.

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and mean-

---

[12] 26 U. S. C. § 5861 (d) (1964 ed., Supp. V).

[13] As respects the *Morissette* case, J. Marshall, Intention—In Law and Society 138 (1968), says:

"The defendant wished to take government property from a

ing of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Id.,* at 263.

At the other extreme is *Lambert* v. *California,* 355 U. S. 225, in which a municipal code made it a crime to remain in Los Angeles for more than five days without registering if a person had been convicted of a felony. Being in Los Angeles is not *per se* blameworthy. The mere failure to register, we held, was quite "unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." *Id.,* at 228. The fact that the ordinance was a convenient law enforcement technique did not save it.

> "Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process. Were it otherwise, the evil would be as great as it is when the law is written in print too fine to read or in a language foreign to the community." *Id.,* at 229–230.

---

government bombing range, he had the capacity to take it, he had the opportunity, he tried and succeeded in taking it (his wish was fulfilled, his act accomplished). For recovery in a tort action no more would have to be shown to establish liability, but the court held that to make his action criminal 'a felonious intent,' *mens rea,* had to be established. This could not be presumed from his actions, which were open, without concealment, and in the belief—according to his statement—that the property had been abandoned. In other words, for the happening to be criminal, the wish had to be to accomplish something criminal. So in discussing intent we may have wishes of two different characters: one giving a basis for civil liability (the wish to take property not one's own), and another which would support criminal liability as well as civil (taking property with criminal intent)."

In *United States* v. *Dotterweich,* 320 U. S. 277, 284, a case dealing with the imposition of a penalty on a corporate officer whose firm shipped adulterated and misbranded drugs in violation of the Food and Drug Act, we approved the penalty "though consciousness of wrongdoing be totally wanting."

The present case is in the category neither of *Lambert* nor *Morissette,* but is closer to *Dotterweich.* This is a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act.[14]   They are highly dangerous offensive weapons, no less dangerous than the narcotics involved in *United States* v. *Balint,* 258 U. S. 250, 254, where a defendant was convicted of sale of narcotics against his claim that he did not know the drugs were covered by a federal act.   We say with Chief Justice Taft in that case:

> "It is very evident from a reading of it that the emphasis of the section is in securing a close supervision of the business of dealing in these dangerous drugs by the taxing officers of the Government and that it merely uses a criminal penalty to secure recorded evidence of the disposition of such drugs as a means of taxing and restraining the traffic.   Its manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute,

---

[14] We need not decide whether a criminal conspiracy to do an act "innocent in itself" and not known by the alleged conspirators to be prohibited must be actuated by some corrupt motive other than the intention to do the act which is prohibited and which is the object of the conspiracy.   An agreement to acquire hand grenades is hardly an agreement innocent in itself.   Therefore what we have said of the substantive offense satisfies on these special facts the requirements for a conspiracy.   Cf. *United States* v. *Mack,* 112 F. 2d 290.

and if he sells the inhibited drug in ignorance of its character, to penalize him. Congress weighed the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided." *Id.,* at 253–254.

*Reversed.*

MR. JUSTICE BRENNAN, concurring in the judgment of reversal.

I agree that the amendments to the National Firearms Act, 26 U. S. C. §§ 5841–5872 (1964 ed., Supp. V), do not violate the Fifth Amendment's privilege against self-incrimination, and join Part I of the opinion of the Court. However, I do not join Part II of the opinion; although I reach the same result as the Court on the intent the Government must prove to convict, I do so by another route.

I join Part I on my understanding of the Act's new immunity provision. 26 U. S. C. § 5848 (1964 ed., Supp. V). The amended registration provisions of the National Firearms Act do not pose any realistic possibility of self-incrimination of the transferee under federal law. An effective registration of a covered firearm will render the transferee's possession of that firearm legal under federal law. It is only appellees' contention that registration or application for registration will incriminate them under California law that raises the Fifth Amendment issue in this case. Specifically, appellees assert that California law outlaws possession of hand grenades and that registration under federal law would, therefore, incriminate them under state law. Assuming that appellees correctly interpret California law, I think that the Act's immunity provision suffices to supplant the

constitutional protection. Section 5848 provides in pertinent part:

"No information or evidence obtained from an application . . . shall . . . be used, directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application . . . ."

In my judgment, this provision would prevent a State from making any use of a federal registration or application, or any fruits thereof, in connection with a prosecution under the State's possession law.[1] This would be true even if the State charged a transferee with possession of the firearm on a date after the date the application was filed, because possession is a continuing violation.[2] Therefore, for purposes of the State's possession law, a transferee's continued possession of a registered firearm would constitute "a violation of law occurring . . . concurrently with the filing of the application."

I agree with the Court that the Self-Incrimination Clause of the Fifth Amendment does not require that immunity be given as to the use of such information in connection with crimes that the transferee might possibly commit in the future with the registered firearm. The only disclosure required under the amended Act is that the transferee has received a firearm and is in possession of it. Thus, in connection with the present general registration scheme, "[t]he relevant class of activities 'perme-

---

[1] No question of transactional immunity is raised here since the case involves incrimination under the laws of a jurisdiction different from the one compelling the incriminating information. *Piccirillo* v. *New York,* 400 U. S. 548, 552 (BRENNAN, J., dissenting).

[2] The result would be the same if a transferee moved from a State where possession was legal to a State where possession was illegal. The time when the possession became illegal cannot affect the continuing nature of the act of possession.

ated with criminal statutes,' " *Mackey* v. *United States, post,* at 710 (BRENNAN, J., concurring in judgment), is limited to the class of activities relating to possession of firearms. *Id.,* at 707–711. Since I read the statute's immunity provision to provide immunity co-extensive with the privilege in that regard, I find no Fifth Amendment bar to the enforcement of the federal statute.

The Court's discussion of the intent the Government must prove to convict appellees of violation of 26 U. S. C. § 5861 (d) (1964 ed., Supp. V) does not dispel the confusion surrounding a difficult, but vitally important, area of the law. This case does not raise questions of "consciousness of wrongdoing" or "blameworthiness." If the ancient maxim that "ignorance of the law is no excuse" has any residual validity, it indicates that the ordinary intent requirement—*mens rea*—of the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy. Nor is it possible to decide this case by a simple process of classifying the statute involved as a "regulatory" or a "public welfare" measure. To convict appellees of possession of unregistered hand grenades, the Government must prove three material elements: (1) that appellees possessed certain items; (2) that the items possessed were hand grenades; and (3) that the hand grenades were not registered. The Government and the Court agree that the prosecutor must prove knowing possession of the items and also knowledge that the items possessed were hand grenades. Thus, while the Court does hold that no intent at all need be proved in regard to one element of the offense—the unregistered status of the grenades—knowledge must still be proved as to the other two elements. Consequently, the National Firearms Act does not create a crime of strict liability as to all its elements. It is no help in deciding what level of intent must be proved as

to the third element to declare that the offense falls within the "regulatory" category.

Following the analysis of the Model Penal Code,[3] I think we must recognize, first, that "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis* v. *United States,* 341 U. S. 494, 500 (1951) (Vinson, C. J., announcing judgment); *Smith* v. *California,* 361 U. S. 147, 150 (1959); [4] second, that *mens rea* is not a unitary concept, but may vary as to each element of a crime; and third, that Anglo-American law has developed several identifiable and analytically distinct levels of intent, *e. g.,* negligence, recklessness, knowledge, and purpose.[5] To determine the mental element required for conviction, each material element of the offense must be examined and the determination made what

[3] ALI Model Penal Code § 2.02, Comment 123–132 (Tent. Draft No. 4, 1955).

[4] "Still, it is doubtless competent for the [government] to create strict criminal liabilities by defining criminal offenses without any element of scienter—though . . . there is precedent in this Court that this power is not without limitations. See *Lambert* v. *California,* 355 U. S. 225." *Smith* v. *California,* 361 U. S. 147, 150 (1959). The situations in which strict liability may be imposed were stated by Judge, now MR. JUSTICE, BLACKMUN: "[W]here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent." *Holdridge* v. *United States,* 282 F. 2d 302, 310 (CA8 1960).

[5] These different levels of intent are defined in the code. ALI Model Penal Code § 2.02 (Prop. Official Draft 1962). This Court has relied on the code's definitions. *Leary* v. *United States,* 395 U. S. 6, 46 n. 93 (1969); *Turner* v. *United States,* 396 U. S. 398, 416 n. 29 (1970).

level of intent Congress intended the Government to prove, taking into account constitutional considerations, see *Screws* v. *United States,* 325 U. S. 91 (1945), as well as the common-law background, if any, of the crime involved. See *Morissette* v. *United States,* 342 U. S. 246 (1952).

Although the legislative history of the amendments to the National Firearms Act is silent on the level of intent to be proved in connection with each element of the offense, we are not without some guideposts. I begin with the proposition stated in *Morissette* v. *United States,* 342 U. S., at 250, that the requirement of *mens rea* "is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." In regard to the first two elements of the offense, (1) possession of items that (2) are hand grenades, the general rule in favor of some intent requirement finds confirmation in the case law under the provisions replaced by the present amendments. The cases held that a conviction of an individual of illegal possession of unregistered firearms had to be supported by proof that his possession was "willing and conscious" and that he knew the items possessed were firearms. *E. g., Sipes* v. *United States,* 321 F. 2d 174, 179 (CA8 1963); *United States* v. *Decker,* 292 F. 2d 89 (CA6 1961). Congress did not disapprove these cases, and we may therefore properly infer that Congress meant that the Government must prove knowledge with regard to the first two elements of the offense under the amended statute.

The third element—the unregistered status of the grenades—presents more difficulty. Proof of intent with regard to this element would require the Government to show that the appellees knew that the grenades were

unregistered or negligently or recklessly failed to ascertain whether the weapons were registered. It is true that such a requirement would involve knowledge of law, but it does *not* involve "consciousness of wrongdoing" in the sense of knowledge that one's actions were prohibited or illegal.[6] Rather, the definition of the crime, as written by Congress, requires proof of circumstances that involve a legal element, namely whether the grenades were registered in accordance with federal law. The knowledge involved is solely knowledge of the circumstances that the law has defined as material to the offense. The Model Penal Code illustrates the distinction:

> "It should be noted that the general principle that ignorance or mistake of law is no excuse is usually greatly overstated; it has no application when the circumstances made material by the definition of the offense include a legal element. So, for example, it is immaterial in theft, when claim of right is adduced in defense, that the claim involves a legal judgment as to the right of property. It is a defense because knowledge that the property belongs to someone else is a material element of the crime and such knowledge may involve matter of law as well as fact. . . . The law involved is not the law defining the offense; it is some other legal rule that characterizes the attendant circumstances that

---

[6] Proof of some crimes may include a requirement of proof of actual knowledge that the act was prohibited by law, or proof of a purpose to bring about the forbidden result. See *James* v. *United States,* 366 U. S. 213 (1961); *Boyce Motor Lines* v. *United States,* 342 U. S. 337 (1952). *United States* v. *Murdock,* 290 U. S. 389 (1933). See generally Note, Counseling Draft Resistance: The Case for a Good Faith Belief Defense, 78 Yale L. J. 1008, 1022–1037 (1969). Cf. Model Penal Code § 2.02 (2) (a) (Prop. Official Draft 1962) (definition of "purposely").

are material to the offense." Model Penal Code § 2.02, Comment 131 (Tent. Draft No. 4, 1955).

Therefore, as with the first two elements, the question is solely one of congressional intent. And while the question is not an easy one, two factors persuade me that proof of *mens rea* as to the unregistered status of the grenades is not required. First, as the Court notes, the case law under the provisions replaced by the current law dispensed with proof of intent in connection with this element. *Sipes* v. *United States, supra.* Second, the firearms covered by the Act are major weapons such as machineguns and sawed-off shotguns; deceptive weapons such as flashlight guns and fountain pen guns; and major destructive devices such as bombs, grenades, mines, rockets, and large caliber weapons including mortars, anti-tank guns, and bazookas. Without exception, the likelihood of governmental regulation of the distribution of such weapons is so great that anyone must be presumed to be aware of it. In the context of a taxing and registration scheme, I therefore think it reasonable to conclude that Congress dispensed with the requirement of intent in regard to the unregistered status of the weapon, as necessary to effective administration of the statute.