Raymond A. McQUOID, Petitioner, Appellant,

v.

Joseph A. SMITH, Sheriff, County of Worcester, Commonwealth of Massachusetts, Respondent, Appellee.

No. 77–1035.

United States Court of Appeals, First Circuit.

Argued April 6, 1977.

Decided June 3, 1977.

Worcester, Mass., was on brief, for appellant.

John J. Bonistalli, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Stephen R. Delinsky, Asst. Atty. Gen., Chief, Crim. Bureau, and Barbara A. H. Smith, Asst. Atty. Gen., Chief, Crim., Appellate Section, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, MARKEY, Chief Judge,* and CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant McQuoid brought this petition for habeas corpus in the district court alleging that his one-year mandatory minimum sentence for carrying a firearm without a license, see Mass.Gen.Laws Ann. c. 269, § 10(a) (1976 Supp.), constitutes cruel and unusual punishment and denies him equal protection of the laws. In a supporting memorandum, he claimed further that imposition of the one-year irreducible sentence violates his due process rights. The district court denied the writ, and also denied petitioner's application for a certificate of probable cause. However, we granted the latter.

The underlying facts were summarized in the Massachusetts Supreme Judicial Court's opinion answering questions of law presented to it on report of the case from the trial judge, *Commonwealth v. McQuoid,* 1976 Mass.Adv.Sh. 763, 344 N.E.2d 179 (1976):

"On April 24, 1975, after finishing work as a loader-operator for the Leicester highway department around noon, the defendant spent the next five or six hours drinking heavily at three different places in the town of Leicester. When he returned home later that day, the defendant learned that his high school class ring had arrived C.O.D. at the post office. Because his wife refused to give him the money to pick up the ring, the defendant decided to sell his gun which was kept at home for his wife's protection. En route to sell the gun, the defendant was

Mel L. Greenberg, Worcester, Mass., with whom Teshoian, Greenberg & Drapos,

* Of the U.S Court of Customs and Patent Appeals, sitting by designation.

stopped by police for operating under the influence of liquor. Pursuant to a search of the defendant, the police found a loaded gun in his pants pocket. The defendant's license to carry the gun had expired several months prior to this incident.

"The trial judge found, pursuant to the defendant's request for findings of fact, that on April 24, 1975, the defendant was not engaged in the commission of a crime of violence nor did he intend to commit a crime by using the gun, but rather that he was carrying it in order to transport it to a gun dealer for sale."

Appellant was thereafter convicted and sentenced to a year in jail under Mass.Gen. Laws Ann. c. 269, § 10(a) (1976 Supp.), which provides in pertinent part:

"Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a firearm, loaded or unloaded, as defined in section one hundred and twenty-one of chapter one hundred and forty without . . . having in effect a license to carry firearms . . . shall be punished by imprisonment in the state prison for not less than two and one-half nor more than five years, or for not less than one year nor more than two and one-half years in a jail or house of correction. The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection (a) be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served one year of such sentence. Prosecutions commenced under this section shall neither be continued without a finding nor placed on file." [1]

We are not persuaded by appellant's constitutional claims and affirm.

Considering the penalties prescribed in Massachusetts and elsewhere for similar and more serious offenses, appellant argues that the prescribed penalty is grossly disproportionate to the offense and hence violative of the eighth amendment. *See Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1909); *In re Lynch,* 8 Cal.3d 410, 105 Cal. Rptr. 217, 503 P.2d 921 (1972). This same argument was considered and rejected by the Supreme Judicial Court in a comprehensive opinion written by Chief Justice Hennessey in *Commonwealth v. Jackson,* 1976 Mass.Adv.Sh. 735, 344 N.E.2d 166 (1976), decided the same day as *Commonwealth v. McQuoid, supra.* We are in substantial agreement with the *Jackson* court's reasoning. Doubtless the penalty is severe, and doubtless it is at variance with the pattern of discretionary sentencing that has been usual in this country in recent times.[2] *Cf. United States v. Foss,* 501 F.2d 522 (1st Cir. 1974). But deterrence is a legitimate penological goal, *see Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and we think the *Jackson* court's analysis amply demonstrates that, in light of the significant dangers associated with uncontrolled weapons, the mandatory one-year minimum sentence is not so grossly disproportionate to prevailing norms and sensibilities as to violate the eighth amendment.

The second facet of appellant's eighth amendment argument is that the penalty's inflexibility will cause it to be applied so arbitrarily and unevenly as to amount to cruel and unusual punishment. *Cf. Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). It is contended that "at various levels of the system—from the police officer on the beat

1. There are numerous exceptions to the strict rule of the statute, including, for example, several for nonresidents in certain circumstances and one for a person who comes into possession of a firearm by devise. *See* Mass.Gen. Laws Ann. c. 140, § 129C.

2. Mandatory minimum sentences are not, however, totally unknown. *See, e.g.,* mandatory minimum sentence of ten years for one "who

engages in a continuing criminal enterprise" in violation of the federal drug abuse prevention and control laws, 21 U.S.C. § 848, upheld against a challenge that it unconstitutionally encroaches on judicial authority. *United States v. Jones,* 438 F.2d 461 (7th Cir. 1971); *United States v. Lewis,* 300 F.Supp. 1171 (E.D. Pa.1969).

to the trial judge in the courtroom—extralegal and even illegal efforts will be made to ameliorate the rigors of the harsh legislative intent." This theory, assuming its applicability to penalties other than death, is wholly speculative. The lack of flexibility in the present statute was obviously seen as a means of obtaining more rather than less uniform enforcement, and we cannot say that the legislature was necessarily wrong in this regard notwithstanding the considerations pointed out by appellant. There is no evidence, *see* footnote 3 *infra,* that the penalty will be imposed "wantonly", "freakishly" or "infrequently", *id.* at 310, 92 S.Ct. 2726 (Stewart, J., concurring), and *id.* at 313, 92 S.Ct. 2726 (White, J., concurring). Unlike situations addressed in *Furman,* the jury retains no discretion to impose or withhold the sentence. In virtually every kind of criminal case, police, juries and judges have some opportunity and often some temptation to exercise discretion extralegally.

Nor does the supposed high likelihood of selective enforcement persuade us that the statute violates the due process clause of the fourteenth amendment. No parallel has been demonstrated between this rigid statute and vague or overly broad laws which encourage discriminatory enforcement because of the amount of discretion granted to arresting and prosecuting officials. *Compare Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), *aff'd* 471 F.2d 88 (1st Cir. 1972); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Gregory v. City of Chicago,* 394 U.S. 111, 120, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring); *Thornhill v. Alabama,* 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The statute gives little discretion to anyone, and it is sheer speculation that officials will decline to enforce it regularly.[3]

Appellant argues that due process would be offended by imposition of a one-year mandatory sentence upon someone who, unaware of the provisions of the law, was carrying a gun without any criminal intent. To convict under section 10(a), it need not be shown that the accused knew of the necessity of a license nor that he possessed criminal *scienter*; on the other hand, it must be established that the accused knew he was in possession of a firearm. *Commonwealth v. Jackson, supra,* 1976 Mass.Adv.Sh. at 750, 344 N.E.2d at 174. With respect to the limited degree of knowledge that need be shown, the statute is no different from others which have been upheld by the Supreme Court, as exceptions to the requirement of proof of "*mens rea*" or "vicious will", regulating products or activities having a dangerous or deleterious effect. One dealing with such products or engaging in such activities may be required to ascertain at his peril whether his actions violate the law. *See United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (possession of grenades); *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (shipping in interstate commerce of misbranded or adulterated drugs); *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (sale of narcotics). *See generally United States v. DeBartolo,* 482 F.2d 312 (1st Cir. 1973). As the Supreme Judicial Court said, "one would hardly be surprised to learn" that carrying a firearm without a license is not an innocent act. *Commonwealth v. Jackson, supra,* 1976 Mass.Adv.Sh. at 751,

---

3. Appellant cites as support a 1976 Report of the Center for Criminal Justice, Harvard Law School, entitled "And Nobody Can Get You Out" which is claimed to show that "police officers have and will sometimes 'look the other way' when an arrest might be made". But the conclusions of the study are to the contrary. After noting a 24% reduction in charges for violation of section 10(a) between 1974 and 1975, the study tests whether the drop is attributable to greater compliance with the law or to lack of enforcement and concludes that the drop "is due primarily to increased citizen compliance", although recognizing that the statistical evidence could not "rule out the argument that police officers can and will sometimes 'look the other way' when an arrest might be made." Without any data supporting his assertion that the police will make arrests based on impermissible criteria, appellant's argument has little force.

344 N.E.2d at 174, *quoting United States v. Freed, supra,* 401 U.S. at 609, 91 S.Ct. 1112. The instant measure serves valid legislative goals in the manner described by the Court in *Morissette v. United States,* 342 U.S. 246, 255–56, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952):

> "Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same . . ."

It is true that this statute not only creates strict liability for the unlicensed carrying of a gun but, unlike the statutes referred to, mandates a one-year irreducible sentence. But this latter consideration relates to whether the penalty is so grossly disproportionate as to violate the eighth amendment. If, as already determined, the severity and inflexibility of the penalty are not such as to render it cruel and unusual, these qualities do not render it any the more violative of the due process clause.

Appellant contends that the statute violates due process because it has the potential of ensnaring into its broadly cast net a large number of people with "innocent" intent. How many such "innocent" people will be ensnared once the existence of the statute is common knowledge seems questionable. Still, it is the nature of strict liability statutes that they may sometimes involve persons whose designs are not, in the ordinary sense, criminal. Society has a right to prohibit and punish not only overtly criminal conduct but other conduct which creates danger, or a sufficient probability of danger, to the community at large. *Morissette v. United States, supra.*

The Supreme Judicial Court treated appellant's equal protection claim fully, *see*

1976 Mass.Adv.Sh. at 765–66, 344 N.E.2d at 180–81, and we have nothing to add to that court's decision in that regard.

*Affirmed.*