Judge Curda, when he was a state prosecutor, personally secured an indictment against Mustafoski less than two years before he acted as a judicial officer in Mustafoski's present case. Even assuming that the prior indictment dealt with an unrelated matter, Judge Curda was disqualified from participating in Mustafoski's present case. For this reason, Judge Curda and Judge Greene should have granted Mustafoski's motion.

**M.R.S., Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–4624.**

Court of Appeals of Alaska.

Feb. 4, 1994.

---

4. We note that the legislature allows a party to waive this ground of disqualification. AS 22.20.-020(b).

Margi Mock, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

M.R.S., a minor, appeals a superior court order waiving children's court jurisdiction

and allowing the state to charge him as an adult with first-degree robbery and attempted first-degree murder. On appeal, M.R.S. contends that the superior court erred during the waiver hearing by allowing expert testimony concerning a psychological evaluation of M.R.S. that had been submitted pursuant to court order in a previous delinquency proceeding involving M.R.S. We affirm.

## FACTS

On January 5, 1992, an Anchorage taxicab driver was robbed; the robber fled after stabbing the driver eight times and cutting his throat. Several days later the state filed a delinquency petition in connection with the incident, charging M.R.S.—then only three months from his eighteenth birthday—with conduct that would have amounted to first-degree robbery and attempted first-degree murder if committed by an adult. The state also petitioned the superior court to waive children's court jurisdiction over M.R.S. pursuant to AS 47.10.060.[1]

At a hearing on the issue of waiver, M.R.S. conceded that the state had established probable cause to believe that he had committed the alleged offenses, leaving in dispute only the issue whether M.R.S. was amenable to treatment as a minor—that is, whether he was capable of being rehabilitated before reaching his twentieth birthday. AS 47.10.060(d). On this issue, the state, over M.R.S.'s objection, called two expert witnesses, Dr. Larry Bissey and Dr. Irvin Rothrock.

Bissey, a psychologist, had prepared a court-ordered psychological evaluation of M.R.S. two years previously, in 1990, to assist in disposition of a delinquency proceed-

ing in which M.R.S. had admitted participating in an armed robbery. Based largely on his 1990 evaluation, Bissey testified at the current waiver hearing that M.R.S. could not successfully be treated by his twentieth birthday. Rothrock, a forensic psychiatrist, had never examined M.R.S. but had reviewed Bissey's 1990 evaluation. Based on this review, Rothrock confirmed Bissey's opinion that M.R.S. was not amenable to treatment as a minor.

After considering the evidence, the superior court found probable cause to support the accusations against M.R.S. and concluded that M.R.S. was not amenable to treatment as a minor. Accordingly, the court ordered children's court jurisdiction waived and authorized the state to proceed against M.R.S. as an adult.

M.R.S. appeals the waiver order, challenging the admissibility of evidence derived from his 1990 court-ordered psychological evaluation. M.R.S. argues, as he did below, that this evidence violated two privileges: his privilege against self-incrimination and the psychotherapist-patient privilege. We consider each privilege in turn.

## PRIVILEGE AGAINST SELF-INCRIMINATION

### 1. Compulsion

M.R.S. contends that all statements he made during the 1990 psychological evaluation, and any information derived therefrom, were sheltered from disclosure by the constitutional privilege against self-incrimination.[2] The constitutional privilege, however,

1. AS 47.10.060 provides, in pertinent part:
 **Waiver of jurisdiction.** (a) If the court finds at a hearing on a petition that there is probable cause for believing that a minor is delinquent and finds that the minor is not amenable to treatment under this chapter, it shall order the case closed. After a case is closed under this subsection, the minor may be prosecuted as an adult.
 . . . .
 (d) A minor is unamenable to treatment under this chapter if the minor probably cannot be rehabilitated by treatment under this chapter before reaching 20 years of age. In determining whether a minor is unamenable to treatment, the court may consider the serious-

ness of the offense the minor is alleged to have committed, the minor's history of delinquency, the probable cause of the minor's delinquent behavior, and the facilities available to the division of youth and adult authority for treating the minor.

2. The Fifth Amendment to the United States Constitution provides in part: "No person ... shall be compelled in any criminal case to be a witness against himself...." Article I, § 9 of the Alaska Constitution similarly provides: "No person shall be compelled in any criminal proceeding to be a witness against himself."

attaches only to statements obtained by government compulsion. *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). It may be, as M.R.S. contends, that he would invoke his constitutional privilege if he were now asked to submit to a psychological evaluation or to repeat his earlier statements. But if the government did not originally compel M.R.S.'s statements, the constitution does not bar the state from relying on them now, even though the statements may have acquired new or different significance.

■ In the present case, the record fails to disclose the requisite element of compulsion. The record establishes that, when the court ordered a psychological evaluation of M.R.S. in 1990 for use in disposition of the delinquency petition then pending against him, M.R.S. did not object; to the contrary, he actively joined the state in requesting that it be ordered. Given that the 1990 evaluation was conducted at M.R.S.'s behest and with his blessing, his statements during the evaluation were seemingly voluntary, rather than compelled.

Taken at face value, the record permits but one conclusion: that M.R.S.'s participation in the psychological evaluation was voluntary rather than compelled, and that, for this reason, the constitutional privilege did not attach to M.R.S.'s statements, or to the psychological evaluation that resulted therefrom. *Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

### 2. *Self-incrimination*

M.R.S. nevertheless contends that the record should not be taken at face value and that, despite the appearance of voluntariness, compulsion should be found. M.R.S. maintains that his failure to assert the constitutional privilege in 1990—and his willing participation in the psychological evaluation—should not be deemed a waiver of his right to invoke the privilege in later proceedings.

In support of this argument, M.R.S. advances a two-pronged theory. First, he suggests that he had no occasion to assert the privilege in the prior delinquency proceeding, since the disposition hearing for which his

1990 evaluation was ordered was the type of non-adversary proceeding—akin to a competency hearing—in which the constitutional privilege would not have applied. *See R.H. v. State,* 777 P.2d 204, 210 (Alaska App.1989). Alternatively, M.R.S. suggests that, when he participated in the 1990 evaluation, he reasonably expected that the results would be disclosed only in connection with the delinquency action then pending against him. M.R.S. reasons that any waiver of the constitutional privilege by him in 1990 did not extend to future proceedings.

Even if we accepted these arguments, however, they would be unavailing. M.R.S.'s alternative theories of compulsion rest on the assumption that, because his 1990 statements were made under circumstances excusing his failure to object on the ground of self-incrimination, his right to object on that ground was preserved and could be resurrected at some later point, regardless of the extent to which the 1990 statements were incriminatory when he originally made them. This assumption, a necessary component of M.R.S.'s claim of compulsion, runs afoul of a separate prerequisite of the constitutional privilege: the requirement of self-incrimination.

■ To be protected under the constitutional privilege, a statement must tend to incriminate its maker: "Without the threat of conviction or punishment, an individual may no[t] ... invoke the protection of the privilege against self-incrimination." *State v. Gonzalez,* 853 P.2d 526, 529 n. 1 (Alaska 1993) (citation omitted). The pertinent question in determining the incriminatory potential of a compelled statement is whether it exposes the witness to a real or substantial hazard of incrimination. *Id.* at 529–30. The resolution of this question necessarily hinges on the circumstances existing when the statement is compelled, for "a witness may not refuse to testify where there is no real or substantial hazard of incrimination[.]" *E.L.L. v. State,* 572 P.2d 786, 788 (Alaska 1977) (citations omitted).

■ Thus, whether the privilege against self-incrimination attaches to a compelled statement depends not on hindsight enlightened by the passage of time, but on foresight

exercised at the time the statement is compelled. This is so because the privilege itself "does not attach in all situations. By its own terms, it cannot be claimed when a witness has no reasonable grounds to fear that an answer might be incriminatory." *State v. Gonzalez*, 825 P.2d 920, 923 (Alaska App. 1992) (citations omitted), *aff'd*, 853 P.2d 526 (Alaska 1993).

■■■ Because the privilege does not attach and cannot be invoked in the absence of a "real or substantial hazard of incrimination," no valid claim of privilege can arise from the speculative possibility that an otherwise non-incriminatory statement might later incriminate the witness as to offenses not yet committed. *United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S.Ct. 948, 955, 63 L.Ed.2d 250 (1980); *Marchetti v. United States*, 390 U.S. 39, 53–54, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968). A contrary finding would be inimical to the privilege against self-incrimination, for the privilege was never meant to "suppl[y] insulation for a career of crime about to be launched." *United States v. Freed*, 401 U.S. 601, 606–07, 91 S.Ct. 1112, 1116–17, 28 L.Ed.2d 356 (1971).

■■■ The claim of privilege M.R.S. asserts here poses this very problem. The statements he now claims to be constitutionally privileged were made in 1990, in connection with his previous delinquency action. M.R.S. did not invoke the privilege in that case. Apart from their potential for incriminating M.R.S. in the then-pending delinquency proceedings, his 1990 statements exposed him to no risk of self-incrimination except as to crimes he had not yet conceived of or committed. This speculative risk of future, self-generated incrimination could not have sustained a claim of privilege in 1990. Since any claim of constitutional privilege M.R.S. might have had in 1990 existed solely by virtue of his then-pending delinquency proceedings, his failure to assert the privilege as to those proceedings—for whatever reason [3]—left him with no privilege to assert.

It is undeniable that, in light of the new charges pending against him, M.R.S.'s prior statements to Bissey have now become incriminatory. But M.R.S. is not being compelled to make those statements now; to the extent the statements were compelled at all, they were compelled long ago, when their incriminatory potential—measured in terms of whether they then posed a real and substantial hazard of incrimination—differed considerably.

In summary, a claim of self-incrimination rests on the circumstances existing at the

---

3. The question of why M.R.S. failed to claim the privilege in 1990 is simply irrelevant for present purposes. The only significant matter at this juncture is that, apart from their potential to incriminate him in the then-pending delinquency proceedings, M.R.S.'s 1990 statements in fact did not expose him to any real or substantial hazard of incrimination when he made them.

It may well be, as M.R.S. contends, that the 1990 disposition hearing was the type of neutral proceeding in which the privilege would not apply. In that event, M.R.S.'s right to assert the privilege as to that hearing arguably would not have constituted a waiver as to other foreseeable proceedings in which his statements might have been incriminatory—at least in the absence of clear prior notice that his statements might be used in those other proceedings. *Cf. Battie v. Estelle*, 655 F.2d 692, 700–01 (5th Cir.1981); *Vanderbilt v. Lynaugh*, 683 F.Supp. 1118, 1123–24 (E.D.Texas 1988), *vacated in part on other grounds, Vanderbilt v. Collins*, 994 F.2d 189 (5th Cir.1993). The issue of waiver becomes moot, however, if M.R.S.'s statements did not in fact expose him to a substantial risk of incrimination apart from their tendency to incriminate him in the delinquency proceeding. Absent any other real or substantial hazard of incrimination, the constitutional privilege would not have attached to M.R.S.'s statements, and M.R.S. would have had no grounds for invoking the privilege when the court ordered the examination.

Likewise, it may be, as M.R.S. alternatively contends, that M.R.S. was led to believe that any waiver of the privilege in connection with the 1990 psychological evaluation would be limited in scope to allowing the use of his statements in the then-pending disposition hearing. In that event, too, M.R.S. could arguably be deemed to have reserved the right to invoke the privilege. *Cf. State v. R.H.*, 683 P.2d 269, 281–82 (Alaska App.1984). But again, M.R.S. would have had the right to reserve the privilege only to the extent that some real or substantial hazard of incrimination existed other than the hazard arising from the pending disposition hearing, as to which M.R.S. was willing to relinquish his claim. Without some independent hazard of incrimination, M.R.S. would have had no remaining basis for claiming the privilege; and without grounds to invoke the privilege at the time, M.R.S. could not have reserved its invocation for some future occasion.

time the statement was made. If a statement was not incriminatory when made, a person cannot retrospectively assert the privilege and insulate the previous statement even though circumstances alter and the statement takes on new incriminatory significance. If, as M.R.S. suggests, his statements at the 1990 examination were compelled because he had no privilege to interpose at that time, he cannot now claim the privilege based on the altered circumstances arising from his new criminal activity. If, as M.R.S. alternatively suggests, he was deterred from raising an objection to the 1990 interview because he was assured that his statements would be used only in the context of determining his disposition in that 1990 juvenile case, his claim fails because he has not shown that his statements had any incriminatory potential, outside that juvenile case, at the time he made them.

The privilege against self-incrimination is not a springing privilege. M.R.S.'s newly filed charges cannot revive a claim of privilege that had no life in the first instance. Accordingly, we conclude that the superior court did not err in denying M.R.S.'s attempt to assert the privilege against self-incrimination in order to bar use of his prior statements at the waiver hearing.

### PSYCHOTHERAPIST–PATIENT PRIVILEGE

M.R.S. separately contends that admission at his waiver hearing of expert testimony derived from his 1990 psychological evaluation violated the psychotherapist-patient privilege. Alaska's psychotherapist-patient privilege is embodied in Alaska Rule of Evidence 504, which, with certain exceptions, prohibits non-consensual disclosure of confidential communications between a patient and the patient's physician or psychotherapist. Subsection 504(b) sets forth the general rule of privilege:

(b) **General Rule of Privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional conditions, including alcohol or drug addiction, among himself, his physician or psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

Under A.R.E. 504(a)(1) and (a)(3), a "patient is a person who ... is examined ... by a ... psychotherapist[;]" a "psychotherapist" includes any licensed psychologist who is "engaged in the diagnosis or treatment of a mental or emotional condition[.]" In this case, it is undisputed that M.R.S. fell within this rule's definition of "patient" when examined by Bissey in 1990 and that Bissey, in turn, was a "psychotherapist."

Subsection 504(d) describes various exceptions to the psychotherapist-patient privilege. Of relevance here is A.R.E. 504(d)(6), which specifies that no psychotherapist-patient privilege arises "[a]s to communications made in the course of an examination ordered by the court of the ... mental or emotional condition of the patient, with respect to the particular purpose for which the examination is ordered[.]" M.R.S. acknowledges this exception but points out that it takes effect only "with respect to the particular purpose for which the examination is ordered[.]" *Id.* Under this rule, the privilege remains in effect when disclosure is sought for any purpose other than the "particular purpose" for which the examination was ordered.

M.R.S. argues that the only purpose of his 1990 court-ordered psychological examination was to assist the court in the disposition of his then-pending delinquency action. Relying on the limited nature of the exception set forth in A.R.E. 504(d)(6), M.R.S. reasons that the "particular purpose" of the 1990 examination was wholly unrelated to his current waiver hearing. Accordingly, M.R.S. argues that, while the court-ordered examination exception would have precluded his invocation of the privilege at the 1990 disposition hearing, the privilege remained in effect—and the exception was inapplicable—in the context of his recent waiver hearing.

The state responds that the general purpose underlying both the 1990 disposition

hearing and the current waiver hearing was essentially the same: to ascertain M.R.S.'s prospects for rehabilitation. The state argues that, for this reason, the court-ordered examination exception applied equally to both proceedings.

In view of the narrow manner in which A.R.E. 504(d)(6) defines the exception for court-ordered examinations, we find the state's argument unpersuasive. The position urged by the state virtually ignores the requirement of particularity contained in the court-ordered examination exception. While it might be fair to say that disclosure of the 1990 psychological evaluation served the same general purposes in the context of the original disposition hearing and the current waiver proceeding, it would stretch both language and credulity to conclude that the use to which the evaluation was most recently put was "the *particular* purpose for which the [1990] examination was ordered." A.R.E. 504(d)(6). In terms of particular purpose, the use of a psychiatric evaluation to determine disposition in the case of a child adjudicated as a delinquent differs significantly from the use of a psychiatric evaluation in a waiver proceeding to determine whether a child may be tried as an adult.

■ Our rejection of the state's argument does not resolve the psychotherapist-patient privilege issue. Under A.R.E. 504, the psychotherapist-patient privilege extends only to "confidential communications." Not all psychotherapist-patient communications are confidential: under A.R.E. 504(a)(4), a communication loses confidentiality when it is "intended to be disclosed to third persons other than those present to further the interest of the patient in . . . the examination . . . or persons who are participating in the diagnosis and treatment under the direction of the . . . psychotherapist[.]"[4]

Here, the circumstances surrounding the 1990 court-ordered examination make it apparent that the parties and the court alike intended M.R.S.'s statements to be disclosed to the children's court, counsel for the state, and various Department of Health and Social Services officials participating in the delinquency proceedings. Disclosure was in fact made to these persons. M.R.S. advances a conclusory argument that, because all of the persons who received the results of his psychological evaluation were involved in the disposition phase of his delinquency case or were to become involved with his treatment following disposition, they all qualified as "persons . . . participating in [M.R.S.'s] diagnosis and treatment under the direction of the . . . psychotherapist" and, as such, were persons to whom disclosure could be made without loss of confidentiality. A.R.E. 504(a)(4).

M.R.S. misreads the rule. Neither the judge who ordered M.R.S.'s psychological evaluation nor the other participants in the 1990 children's court proceedings who received information concerning the evaluation's results are encompassed in the sphere of psychotherapist-patient confidentiality described by A.R.E. 504(a)(4). Even if the various persons to whom the evaluation was disclosed could be deemed to have been "participating in the diagnosis and treatment" of M.R.S.—a shaky proposition in itself—their participation clearly was not "under the direction of the . . . psychotherapist," Bissey. To the contrary, here it was Bissey who acted under the direction of the court in preparing the evaluation.

The commentary to the Alaska Rules of Evidence confirms that the confidential communication provision cannot be read as broadly as M.R.S. would have us read it. With respect to A.R.E. 504(a)(4), the commentary indicates that "[c]onfidential communication is defined in terms conformable with those of the lawyer-client privilege, Rule 503(a)(5), with changes appropriate to the difference in circumstance." Alaska Evidence Rules Commentary, Rule 504(a)(4). The commentary to Rule 503(a)(5), in turn,

---

4. The term "confidential communication" is defined as follows in A.R.E. 504(a)(4):

(4) A communication is confidential if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

reveals that, in the attorney-client context, the provision relating to third-party disclosure was meant to be limited to the narrow sphere of "persons to whom disclosure is in furtherance of the rendition of professional ... services to the client, contemplating those in such relation to the client as 'spouse, parent, business associate, or joint client.'" Commentary, Rule 503(a)(5).

In M.R.S.'s case, the children's court judge and the various other persons who were given Bissey's evaluation in 1990 were in no realistic sense acting in furtherance of the rendition of professional services to M.R.S. by Bissey. At most, those persons received the results of the professional services Bissey had already rendered. To the extent that the court, the state's attorney, and various Department of Health and Social Services officials had it within their power to suggest, order, or provide further treatment for M.R.S., that treatment would plainly have gone beyond the professional services Bissey rendered and would not have been "under the direction of" Bissey.

 Cases construing language functionally identical to that contained in A.R.E. 504(a)(4) have concluded that, "[i]f a patient makes a communication expecting it to be

disclosed to persons other than those excepted in [that] subsection ..., there is no privilege." *Lora v. Board of Education*, 74 F.R.D. 565, 585 (E.D.N.Y.1977); *see also Matter of Sherry C. and John M.*, 113 N.M. 201, 824 P.2d 341, 347 (App.1991); 8 John H. Wigmore, *Wigmore on Evidence* § 2285 (McNaughton rev. 1961). When a person is aware that an examination is made at the request of and for use by the court, any statements made ordinarily cannot be confidential. *See Meador v. State*, 101 Nev. 765, 711 P.2d 852, 855 (1985), *overruled on other grounds, Talancon v. State*, 102 Nev. 294, 721 P.2d 764 (1986).

As we have already noted, in the present case, the circumstances involved in the 1990 children's court proceeding make it abundantly clear that M.R.S. and his counsel understood that M.R.S.'s communications with Bissey would be disclosed to the court and to other participants associated with the scheduled disposition hearing. Indeed, M.R.S. has never claimed that he did not intend such disclosure to occur. For this reason, the statements M.R.S. made to Bissey in the course of the psychological evaluation were not confidential communications under A.R.E. 504(a)(4).[5] Thus, at his current waiv-

5. Our interpretation of the definition of confidential communications gives effect to the plain meaning of A.R.E. 504(b)(4). At first blush, however, this interpretation, which would effectively exempt court-ordered evaluations from a claim of privilege in almost all circumstances, might appear to render superfluous the exception for court-ordered psychiatric examinations stated in A.R.E. 504(d)(6), which more narrowly exempts *court-ordered examinations* from a claim of privilege when disclosure is sought for "the particular purpose for which the examination is ordered." This would arguably weigh against interpreting subsection (a)(4) in accordance with its plain meaning, since the rules of statutory construction normally counsel against interpreting a rule or statute in a manner that renders other provisions meaningless. *Matter of E.A.O.*, 816 P.2d 1352, 1357 (Alaska 1991); *In re Estate of Hutchinson*, 577 P.2d 1074, 1075 (Alaska 1978).

In this regard, however, it is worthwhile mentioning that some commentators have specifically suggested that an exception for court-ordered psychological examinations is in fact unnecessary because such examinations fall outside the purview of confidential communications. *See, e.g.*, Samuel J. Knapp, et al., *Privileged Communications for Psychotherapists in Pennsylvania: A*

*Time for Statutory Reform*, 60 Temp.L.Q. 267, 286 (1987) ("Court-ordered examinations do not violate the spirit of the privilege because treatment is not contemplated and do not affect the privileged status of other psychotherapeutic relationships."); Abraham S. Goldstein and Jay Katz, *Psychiatrist–Patient Privilege: The GAP Proposal and the Connecticut Statute*, 36 Conn.B.J. 175, 187 (1962) ("It is arguable that such an exception need not have been included ..., because a patient examined [by order of a court] is not consulting a psychiatrist 'for the purpose of securing diagnosis or treatment of his mental condition.'"). *See also* 2 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* § 504[07] at 504–33 (1989).

Moreover, closer scrutiny indicates that our interpretation of subsection (b)(4) does not actually render the court-ordered examination exception superfluous. Although the commentary to A.R.E. 504 sheds no light on the issue, we believe that the exception set out in A.R.E. 504(d)(6) serves at least three potentially useful purposes, even when (a)(4) is read, as we read it, to mean that any statement made in the course of a court-ordered examination is not confidential if disclosure to the court is contemplated.

First, on some occasions, courts may order psychological evaluations prepared by psycho-

er hearing, M.R.S. had no right to invoke the psychotherapist-patient privilege, with respect to testimony derived from his earlier statements to Bissey.

## CONCLUSION

M.R.S. has asserted no basis for excluding the disputed evidence apart from his claims that the evidence violated his privilege against self-incrimination and the psychotherapist-patient privilege. Since we have rejected both of those claims, we conclude

that the trial court did not err in admitting the disputed evidence.

The superior court's order waiving children's court jurisdiction is AFFIRMED.

therapists who have already rendered services to the patient and who will thus be placed in a position of disclosing to the court psychotherapist-patient statements that pre-date the court order. In such circumstances, subsection (d)(6) would be necessary to assure full disclosure, since the pre-order statements would not have been made in contemplation of disclosure to the court. Second, the definition of confidential communications set out in subsection (d)(4) focuses on the patient's intent to disclose as determinative of confidentiality. There may be instances in which court-ordered examinations occur without any subjective awareness on the patient's part that disclosure to the court or to other participants in the court proceedings is contemplated. In such situations, subsection (d)(6) would authorize limited disclosure regardless of the patient's intent. Third, a judge may at times be called upon to seek disclosure of a court-ordered evaluation in the patient's absence; in such cases, issues concerning the patient's subjective intent to maintain confidentiality might arise in a context where the patient's intent could not readily be ascertained. Because the patient is the holder of the psychotherapist-patient privilege and the psychotherapist is authorized to invoke the privilege on the patient's behalf, see A.R.E. 504(c), the psychotherapist might feel constrained to maintain confidentiality in the absence of an express waiver or a specifically stated exception. In such cases, subsection (d)(6) would clarify the situation by plainly informing the psychotherapist that, regardless of the patient's intent, the privilege could not properly be asserted if disclosure was sought for the particular purpose for which the examination was ordered.